IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ENABLE HEALTHCARE, INC., a New Jersey Corporation, ) | CASE NO.: |
| ) | |
| ) | JUDGE |
| Plaintiff, ) | |
| ) | |
| v. ) | **VERIFIED COMPLAINT** |
| ) | |
| CLEVELAND QUALITY HEALTHNET, ) | |
| LLC, an Ohio Limited Liability Company, ) | (JURY DEMAND ENDORSED HEREON) |
| ) | |
| Defendant. ) | |
| ) | |

## **PARTIES**

1. The Plaintiff in this matter, Enable Healthcare Inc. (referred to as "EHI"), is a New Jersey business Corporation with a principal place of business located at 100 Eagle Rock Avenue - Suite 306, East Hanover, NJ 07936.

2. The Defendant in this matter, Cleveland Quality Healthnet, LLC (referred to as "CQH"), is an Ohio limited liability company with a principal place of business at 464 Richmond Road - Suite 104, Richmond Heights, OH 44143.

## **JURISDICTION**

3. The Plaintiff brings this Complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## **CLAIMS**

4. The Plaintiff is seeking injunctive relief, the imposition of a constructive trust, contract damages and compensatory damages as well as the collection of a book account pursuant to the terms of a contract between the parties. The individual Counts of the Complaint

sound in (I) Declaratory Judgment – Interpretation Of Contract, (II) Anticipatory Repudiation/Breach of Contract, (III) Unjust Enrichment, (IV) Book Account, (V) Accounting, (VI) Constructive Trust and (VII) Injunctive Relief.

## BACKGROUND AND FACTS

A.  **Background 2013 And Formation Of CQH**

5. In May of 2013 the Senior Business Development executive of EHI, Dr. Venkat Bala, was introduced to Dr. Corattur Natesan.

6. Dr. Natesan practices Internal Medicine and Primary Care at Faith Medical, 11201 Shaker Blvd., Suite 240, Cleveland Ohio 44104.

7. Although Dr. Natesan became one of the principals of CQH, that LLC did not yet exist.

8. CQH would later be created for purposes of becoming an ACO as detailed below.

9. Through Dr. Natesan, EHI was introduced to other doctors including Dr. Beejadi Mukunda and Dr. Harigopal Balaji.

10. Dr. Bala and EHI introduced the concept of Accountable Care Organizations ("ACOs") to these doctors in May of 2013.

11. The concept of "Pay for Performance" and ACOs was just gaining traction at that time and many of the doctors did not know about ACOs.

12. ACOs provide a vehicle for groups of Primary Care Physicians to band together and form an association or entity, which when combined service at least "5000 Medicare Lives" at a minimum in any given year.

13. After these preliminary meetings, this group of doctors was prepared to complete and file the application to become a Medicare Shared Savings Program ("MSSP") ACO

participant with Centers for Medicare and Medicaid Services ("CMS").

14. CMS (Medicare) provides baseline information on funds spent during the last three years on the 5000 lives and the doctors work towards containing future costs for these patients; if spending in future years comes under the last 3 year benchmark average - the savings realized by CMS is then split 50/50 between CMS and doctors, thus creating an incentive for the doctors to not spend Medicare money irresponsibly and to proactively manage the care of their patients.

15. EHI was engaged to complete the application process and EHI guided the newly formed ACO in filing the necessary Letter of Intent online with CMS, as well as assisting in the formation of CQH.

16. In June 2013, a project team was formed at EHI to assist in the application process and organization of CQH as an ACO and to assist in the preparation of the Participation Agreement to be signed by the various participating physicians.

17. EHI then met with the complete group of doctors in Ohio to explain the concept, advantages and mechanics of the ACO process.

18. The lead group of Doctors Mukunda, Natesan and Balaji provided a list of doctors who would be recruited to join CQH.

19. CQH agreed to pay $20,000 upon successful completion of the application process and payment was to be made by CQH to EHI upon successful submission.

20. This was a relatively small negotiated fee, because EHI recognized that if the participating group were approved as an ACO, then EHI would be the exclusive provider of technology and consulting services, for which it would be paid fees out of the revenue generated through the ACO process if cost savings were realized.

21. Technology is an important component of Population Health Management, a critical component of the ACO model. Savings in health care is obtained by 'identifying gaps in care' and filling them so that preventive care is provided in an organized and systematic manner. If the gaps in care are addressed - it reduces the health risks and in turn reduces future healthcare costs.

22. Participating in this process creates no downside for the physicians affiliating with the group. This is because those doctors continue to get paid their respective 'fee for services' as before and that this does not change as a result of participating in an ACO.

23. If, however, collectively the group achieves a minimum savings threshold of 3.6% set by CMS, there is a bonus and the ACO gets to split the "savings" with CMS.

24. In July 2013 there were additional meetings to solidify the group of doctors that would be participating so that there would be a collectively number of patients to qualify for the 5000 Medicare Beneficiaries eligibility threshold.

25. All of the required application forms were finally successfully filled out due to the constant communications between EHI and the CQH participants.

26. EHI engaged Mr. William Runco of the South East Michigan Accountable Care Organization to provide expert advice and consulting services to CQH at a cost of $5000.

27. The ACO application was successfully submitted by the deadline date of July 31, 2013.

28. Throughout the application process and Requests for Information ("RFI"), EHI acted and responded with minimal assistance from CQH.

29. During this time, additional doctors were recruited to the ACO.

30. In September 2013, a second RFI was received from CMS and satisfactory

information was provided by EHI to permit the process to move forward.

31. In September 2013, another RFI was also addressed by EHI to the satisfaction of CMS.

32. Approval of CQH as an ACO was confirmed by a letter received on October 30, 2013.

33. EHI personnel facilitated an introductory call among CQH members and CMS on October 18, 2013.

34. In November 2013, Dr. Natesan was appointed as the "ACO Executive" for ACO Communications with CMS.

35. Webinars were hosted to educate the participating physicians.

36. A meeting with the executives of CQH was conducted on November 22, 2013.

37. The CQH members were guided through the election process of their governing body.

38. In December 2013 there was a kickoff conference hosted by CMS for the ACO groups that would be starting on January 1, 2014, including the CQH members.

39. EHI continued to provide organizational, financial and technological advice to CQH executives throughout this time.

**B.     Background 2014 And The Start Of The Consulting Agreement**

40. CQH was published in the CMS directory as a qualified ACO starting January 1, 2014.

41. At that point, there were discussions and draft agreements with regard to the Consulting Agreement with EHI, and a final version of the agreement was sent to CQH on January 31, 2014.

5

42. After some final revisions, EHI and CQH entered into a Consulting Agreement dated February 20, 2014.

43. The parties structured the contract in such a way that the ACO would not pay EHI any substantial amounts of money until such time as CQH made money by qualifying for a bonus from CMS.

44. EHI agreed upon a fee of $370,000 per year for providing the technology platform and a support team - plus 12% of profits if and when CQH got that bonus.

45. There was a meeting in Cleveland with the CQH participants and EHI to plan the next steps, provide educational materials and various strategies to achieve the goals of the ACO and provide preventative care to cover any gaps in health care.

46. Funding requirements for the ACO were discussed during March of 2014 with CQH executives.

47. EHI provided task lists, conducted conference calls, prepared data analysis and educated staff members as to recording and reporting as well as assisting the various staffs members with patient inquiries and how best to address them.

48. This included the requisite opt-out letters for patients concerned about sharing of personal healthcare data.

49. The education process was complex and complicated, providing information on Accountable Care Organizations, patient communication, data validation, training, resources, financial analyses and the like.

50. By April 2014, many of these processes were in full swing and the monthly downloading of data was started in April 2014.

51. The data extraction and analysis was performed by EHI through its platform, the

6

"ACO Advantage Platform," to present to participating physicians and ACO's management and Executive Team with documents that were readable and comprehensible. This Platform provides detailed analytics regarding patient utilization, as well as gaps in care.

52. The ACO Advantage Platform also provides the ACO management with access to the performance of participating providers and individual doctors were provided with individual access so that their performance could be self-evaluated.

53. Brochures were printed for each of the participating practices.

54. Individual practice assessment questionnaire were prepared and forwarded to all the practices with follow-up evaluation.

55. EHI introduced various vendors to CQH as envisioned by the consulting Agreement, including Lab Corp., Qwest, Companion DX, Sleep Lab, and DME-Durable Medical Equipment Company.

56. CQH management and individual physicians were trained on the ACO Advantage Platform.

57. Various participating practices that were part of CQH were visited for assessment and evaluation and a date website was built to coordinate efforts.

58. Marketing efforts were conducted to increase the presence of the participating doctors of CQH.

59. In June 2014, EHI began to develop relationships between CQH and various nursing home facilities.

60. This was in addition to the continuing efforts to visit the participating practices.

61. EHI started recruiting nurses to its payroll so that Annual Wellness Visits could be performed for CQH beneficiaries (i.e. patients) and any possible "gaps in care" could be

identified and eliminated.

62. During July and August 2014, additional strategies were developed and presented to the participating doctors including ownership and operation of a diagnostic sleep center and an imaging center, better engagement with nursing home facilities, nursing support services, experts in malpractice and other insurance needs, blood labs and other vendors.

63. This included the identification of a survey vendor to conduct the year-end survey on behalf of CQH which is required by CMS.

64. Through the Fall of 2014, EHI continued to advise, support and educate CQH executives and members of the benefits and practices required to succeed, as well as providing Annual Wellness Visits for patients of the participating practices

C. **Background 2015**

65. In the first part of 2015, EHI worked with CQH and CMS to complete the Group Practice Reporting Option ("GPRO") to report the ACO's performance for the year 2014.

66. EHI also continued providing Annual Wellness Visits for the patients of the participating practices.

67. The results for calendar year 2014 resulted in a percentage savings of 1.27%, which was short of the 3.56% savings required for Shared Saving Bonuses for the year 2014.

68. Thus, there was no bonus for the year 2014.

69. This information was communicated to CQH which was advised that with a combination of the reduction in Hospital Reimbursements, a reduction in lab, imaging and home agencies reimbursements for 2015, along with only a minimal effort by CQH, the Shared Saving Bonus could be achieved for the year 2015.

70. Towards the end of 2015, EHI arranged with Professional Research Consultants

Inc. to conduct the survey for the 2015 performance year reporting by CQH.

71. EHI worked with CQH on the Annual Certification of Access to Health Plan Management System ("HPMS") and finalize the data abstraction and loading of data onto ACO Advantage Platform for use by CQH.

**D.** **Background 2016**

72. In January 2016, the executives of CQH were contacted once again by EHI about the GPRO reporting for the calendar year 2015.

73. The GPRO reporting had been done for the year previously (calendar year 2014) back in March 2015.

74. The management team of CQH wanted the individual doctors to be billed for the reporting function, however, the physicians refused to pay for that.

75. The Consulting Agreement contract specifically excludes GPRO reporting as a separate function that would have require a separate additional payment if performed by EHI.

76. Nevertheless, EHI continue to work with Professional Research Consultants Inc. to conduct the year-end survey for the 2015 performance year reporting which was, as noted above, required by CMS.

77. In February 2016, EHI reminded CQH of the reporting requirement.

78. On February 9, 2016, Dr. Mukunda and EHI had a discussion about the deadlines for GPRO and the outstanding accounts payable due EHI for the Annual Wellness Services that had been rendered on behalf of the individual practices.

79. The outstanding accounts payable issue was not resolved at the time.

80. In late February, the CQH executive Dr. Mukunda approached EHI, requesting that it conduct the GPRO reporting, however, they could not reach an agreement on this extra-

contractual request.

81. As EHI did not perform the reporting, CQH must have either done the reporting work in-house or engaged another entity to complete the reporting activity, as subsequent events have confirmed that it was in fact completed in a timely fashion.

82. Despite numerous attempts to communicate with CQH, EHI could get no further information from CQH with regard to the performance of the ACO for the calendar year 2015.

83. CMS makes the performance information available on its website, Data.CMS.gov.

84. According to their website, the performance of CQH for the year 2015 is as follows:

| | |
|---|---|
| Total beneficiaries | 5,416 |
| Total Historical Benchmark | $98,324,869 |
| Total Expenditure in 2014 | $91,850,754 |
| Savings | $6,474,115 |
| Earned Shared Savings | $2,935,564 |
| % Saving | 6.58% |

85. Accordingly, CQH is entitled to a substantial payment of the Earned Shared Savings in the amount of $2,935,564, having surpassed the requirement of 3.6%.

86. Based on the provisions of the Consulting Agreement, because CQH qualified for this payment, EHI is entitled to be paid the following amounts:

$370,000 for 2014-15
$370,000 for 2015-16
$352,267.68 (representing 12% of the Earned Shared Savings of $2,935,564)
$1,092,267.70 total payments under the contract

87. In addition, EHI is entitled to $12,500 per month for the period of time (seven months) to this date in 2016 for the use of the technology platform as per the provisions in the contract, totaling another $87,500.

88. There is also an unsatisfied invoice for the year-end reporting purposes for

calendar year 2014 in the amount of $10,800.

89. Against those payments due, CQH is entitled to a credit of $60,000 for payments made.

90. In other words, EHI is owed a grand total of $1,110,567.68.

91. Despite numerous attempts to contact CQH to confirm that payment will be forthcoming to EHI when CMS releases the funds, CQH has become totally non-communicative.

92. Accordingly, this action is necessary to confirm the existence and validity of the Consulting Agreement of February 20, 2014 and protect the amounts due and owing to EHI under that agreement.

## FIRST COUNT
### (Declaratory Judgment – Interpretation Of Contract)

93. Plaintiff repeats the previous paragraphs and incorporates same herein as though set forth at length herein.

94. The Plaintiff and the Defendant agreed to a contract for services dated February 20, 2014, a copy of which is attached hereto as Exhibit A.

95. The parties had clear and unambiguous obligations and rights under the contract.

96. Plaintiff has complied with its obligations under the contract.

97. In the past Defendant has failed to satisfy its obligations under the contract, and based on its conduct as indicated that it has anticipatorily repudiated future obligations thereunder.

98. It is respectfully requested that the Court review and enforce the terms of the contract dated February 20, 2014.

99. If that does not occur, the Plaintiffs will sustain substantial and irreparable damages.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment interpreting the terms, rights and responsibilities of the Consulting Agreement dated February 20, 2014 to ensure that the rights of the Plaintiff are protected.

## SECOND COUNT
### (Anticipatory Repudiation/Breach of Contract)

100.   Plaintiff repeats the previous paragraphs and incorporates same herein as though set forth at length herein.

101.   The Plaintiff and Defendant agreed to a contract for services.

102.   Defendant has failed to satisfy the conditions of the contract and, as such, has breached the contract.

103.   Plaintiff has properly complied with its obligations under the contract.

104.   Defendant has indicated that it will fail to comply with the terms and conditions of the contract by, among other things, failing to confirm that the Plaintiff will receive its rightful compensation thereunder.

105.   Defendant's previous breaches of contract and anticipatory repudiation of its obligations are material.

106.   As a result of those breaches, the Plaintiff has and will continue to sustain damages.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment against the Defendant Cleveland Quality Healthnet, LLC for compensatory damages, interest and cost of suit.

## THIRD COUNT
### (Unjust Enrichment)

107.   Plaintiff repeats the previous paragraphs and incorporates same herein as though

set forth at length herein.

108. The Plaintiff and Defendant initially agreed to a contract for the provision of certain services that would entitle the Defendant to receive certain funds which Defendant would not otherwise have received.

109. Defendant has failed to properly compensate the Plaintiff for time, money, efforts and resources expended on its behalf by the Plaintiff.

110. As such, the Defendant has been unjustly enriched.

111. The Plaintiff has been deprived of amounts and owing pursuant to the contract.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment against the Defendant Cleveland Quality Healthnet, LLC for the value of services and for compensatory damages, interest and cost of suit.

## FOURTH COUNT
### (Book Account)

112. Plaintiff repeats the previous paragraphs and incorporates same herein as though set forth at length herein.

113. There is a specific amount due and owing under the contract to the Plaintiff as a result of the time, money, efforts and resources expended on Defendant's behalf.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment against Defendant Cleveland Quality Healthnet, LLC for compensatory damages, interest and cost of suit.

## FIFTH COUNT
### (Accounting)

114. Plaintiff repeats the previous paragraphs and incorporates same herein as though set forth at length herein.

115. Funds are due and owing under the contract to the Plaintiff as a result of the time, money, efforts and resources expended on Defendant's behalf.

116. Defendant will be receiving funds from CMS in approximately mid-to late September, 2016 in the amount of $2,935,564 of which a substantial portion is due and owing to the Plaintiff.

117. Claims by the Plaintiff are in excess of $1,100,000.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment against the Defendant Cleveland Quality Healthnet, LLC for an accounting for any and all proceeds from CMS and for compensatory damages, interest and cost of suit.

### SIXTH COUNT
### (Constructive Trust)

118. Plaintiff repeats the previous paragraphs and incorporates same herein as though set forth at length herein.

119. Funds are due and owing under the contract to the Plaintiff as a result of the time, money, efforts and resources expended on Defendant's behalf.

120. Defendant will be receiving funds from CMS in approximately mid-to late September, 2016 in the amount of $2,935,564 of which a substantial portion is due and owing to the Plaintiff.

121. Claims by the Plaintiff are in excess of $1,100,000.

122. The funds to be received by Defendant from CMS should be held in custodia legis pending the outcome of an accounting and this action.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. demands judgment placing any and all proceeds from CMS into a constructive trust held for the benefit of, among others, Enable Healthcare, Inc. and for compensatory damages, interest and cost of suit.

### SEVENTH COUNT
### (Injunctive Relief)

123. Plaintiff repeats the previous paragraphs and incorporates same herein as though

set forth at length herein.

124. Plaintiff has shown a strong or substantial likelihood or probability of success on the merits and has made out a prima facie case of being entitled it to payments under the Consulting Agreement of February 20, 2014.

125. Plaintiff has shown irreparable injury in that the proceeds for which the Plaintiff has worked may be subject to dissipation, distribution and disappearance unless the status quo is preserved.

126. The injunctive relief would not harm third parties since no other parties are affected by the preservation of the status quo.

127. The public interest would be served by issuing the injunctive relief since the Court is simply enforcing a legal and binding contract.

**WHEREFORE**, Plaintiff Enable Healthcare Inc. respectfully requests that the Court, in its discretion, enter an Order for preliminary injunctive relief prohibiting the distribution of proceeds from CMS until further Order of the Court.

    Respectfully submitted

    /s/ Carl F. Muller
    Carl F. Muller (0014781)
    Victoria L. Vance (0013105)
    Tucker Ellis LLP
    950 Main Avenue
    Suite 1100
    Cleveland, OH 44113-7213
    Tel:    216.592.5000
    Fax:    216.592.5009
    E-mail:    carl.muller@tuckerellis.com
                victoria.vance@tuckerellis.com

Of Counsel:

Jonathan D. Clemente (*pro hac vice* pending)
Mark A. Clemente (*pro hac vice* pending)
Clemente Mueller, PA
Post Office Box 1296
Morristown, NJ 07960-1296
Tel:    973.455.8008
Fax:    973.455.8118
E-mail:    jclemente@cm-legal.com
           mclemente@cm-legal.com

*Attorneys for Plaintiff Enable Healthcare, Inc.*

## **JURY DEMAND**

Plaintiff demands a trial by a jury of twelve members on all issues triable by right to a jury.

                                                                   s/ Carl F. Muller
                                                          *One of the Attorneys for Plaintiff Enable Healthcare, Inc.*

## VERIFICATION

Anthony Subbiah, of full age, being duly sworn according to law, upon his oath, deposes and says:

1. I am the Vice-President Strategic Marketing for the Plaintiff, Enable Healthcare, Inc., in this matter and the statements made in this Verified Complaint are true to the best of my knowledge.

2. I certify that the statements are true and if any of the statements made by me are knowingly false, I am subject to punishment.

_____
**ANTHONY SUBBIAH**

**Vice President**
**Strategic Marketing**
**Enable Healthcare, Inc.**

September __09/26/2016__, 2016