**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Enable Healthcare, Inc.,** | ) | **CASE NO. 1:16 CV 2395** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Cleveland Quality Healthnet, LLC,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Plaintiff's Motion for Preliminary Injunction (Doc. 5). This lawsuit arises from a Consulting Agreement entered into by the parties on February 20, 2014. Plaintiff Enable Healthcare, Inc. asserts that it has fulfilled its obligations under the agreement and is entitled to payment from defendant Cleveland Quality Healthnet, LLC for its services. The Court has diversity jurisdiction over this lawsuit. For the reasons that follow, plaintiff's motion is DENIED.

**FACTS**

Except as otherwise noted, the facts are taken from plaintiff's Verified Complaint. Although defendant filed an Answer disputing plaintiff's allegations, it has largely assumed the

truth of the allegations for purposes of plaintiff's motion for preliminary injunction. Aside from one email, defendant has not submitted any evidence in support of its opposition to the motion.

Plaintiff met with a group of doctors in May of 2013 to address the concept of Accountable Care Organizations ("ACOs."). (Compl. ¶ 5-10). ACOs provide a way for primary care physicians to form an association that service at least "5000 Medicare Lives" in a given year. (*Id.* ¶ 12). The ACO may then apply to participate in the Medicare Shared Savings Program ("MSSP") with the Centers for Medicare and Medicaid Services ("CMS"). CMS provides information to the ACO on funds spent during the last three years by CMS on the 5000 lives. (*Id.* ¶ 14). The ACO then works toward containing future costs. If the group of doctors achieve a specified savings threshold on the last three-year average, the savings realized by CMS is split evenly between CMS and the ACO ("Shared Savings"). (*Id.*).[1]

Plaintiff met with the doctors to explain the concept of an ACO. Defendant engaged plaintiff to assist in the formation of the ACO, complete the application process, and guide the newly formed ACO to file the necessary Letter of Intent online with CMS. (*Id.* ¶ 15). In June 2013, plaintiff formed a project team to assist in the application process and organization of defendant as an ACO and to assist in the preparation of the Participation Agreement to be signed by the various participating physicians. (*Id.* ¶ 15). Plaintiff then met with the complete group of doctors in Ohio to explain the concept, advantages, and mechanics of the ACO process. (*Id.* ¶ 16). The lead group of Doctors Mukunda, Natesan, and Balaji provided a list of doctors who would be recruited to join defendant. (*Id.* ¶ 17).

Defendant agreed to pay $20,000 upon successful completion of the application process.

---

[1] The doctors continue to be paid their regular fee for services. (*Id.* ¶ 22).

Plaintiff claims that it accepted the relatively small upfront fee because if the group obtained approval as an ACO, plaintiff would be the exclusive provider of technology and consulting services for the ACO. As a consultant, it would help the group identify gaps in care which the group could then address, thereby reducing health risks and, in turn, reducing future costs. (*Id.* ¶¶ 19-21).

For the remainder of 2013, plaintiff worked on organizing the group, educating them, and applying for ACO approval. The application was submitted on July 31, 2013. The ACO was approved on October 30, 2013, and plaintiff continued to provide organizational, financial, and technological advice to defendant's executives so that the collection and analysis of data could begin in 2014. (*Id.* ¶¶ 24-39).

CMS identified defendant as a qualified ACO in its directory starting January 1, 2014. (*Id.* ¶ 40). On February 20, 2014, plaintiff and defendant entered into the Consulting Agreement at issue in this case. Plaintiff agreed on a fee of $370,000 per year for providing the technology platform and a support team, plus 12% of profits if defendant qualified for Shared Savings with CMS. (Consulting Agreement, Ex. B). Following the agreement, plaintiff worked with defendant to plan the next steps, provide educational materials, and identify strategies to achieve defendant's cost-savings goals. (*Id.* ¶ 45). Plaintiff conducted conference calls, prepared data analysis, and educated staff members. (*Id.* ¶ 47).

By April of 2014, plaintiff began data extraction and analysis. Plaintiff performs this analysis through its proprietary platform, the ACO Advantage Platform. (*Id.* ¶ 51). The platform provides detailed analytics regarding patient utilization, as well as gaps in care. (*Id.*). A portal was available to the ACO management so that it could access the performance of participating

providers. Individual doctors could also access and monitor their own performance. (*Id.* ¶ 52). Throughout this process, plaintiff printed brochures for each of the participating practices, forwarded individual practice assessment questionnaires to all of the practices with follow-up evaluation, trained defendant's management and individual physicians on plaintiff's platform, visited participating practices for assessment and evaluation, built a website to coordinate exposure and information, and conducted marketing efforts to increase the presence of defendant's participating doctors. (*Id.* ¶¶ 53-58).

In June of 2014, plaintiff began developing relationships between defendant and various nursing home facilities. It added nurses to its payroll to conduct annual wellness visits for patients in an effort to identify and eliminate gaps in care. During July and August of 2014, plaintiff developed additional strategies for cost savings. Plaintiff also identified a survey vendor to conduct the year-end survey for defendant that is required by CMS. (*Id.* ¶¶ 61-63).

In the first part of 2015, plaintiff worked with defendant to complete the Group Practice Reporting Option to report defendant's performance for 2014. (*Id.* ¶ 65). The results showed a savings of 1.27%, short of the 3.56% savings required for defendant to receive Shared Savings from CMS.

Toward the end of 2015, plaintiff arranged with a consultant to conduct the 2015 survey. Plaintiff worked with defendant to finalize the data abstraction and loading of data onto the ACO Advantage Platform for use by defendant. (*Id.* ¶ 71). In January of 2016, plaintiff contacted defendant about the Group Practice Reporting Option. Defendant's management team wanted individual doctors to pay for the reporting function, but the physicians refused to do so. (*Id.* ¶ 74). The Consulting Agreement excludes Group Practice Reporting as a separate function that

would have required a separate additional payment if performed by plaintiff. (*Id.* ¶ 75). Plaintiff, however, continued to work with the consultant to conduct the year-end survey for the 2015 performance year reporting. (*Id.* ¶ 76).

In February 2016, plaintiff reminded defendant of the reporting requirement. On February 9, 2016, plaintiff and Dr. Mukunda discussed the deadlines for reporting and the outstanding accounts payable due plaintiff for the annual wellness services that it had rendered on behalf of the individual practices. The outstanding accounts payable issue was not resolved at this meeting.(*Id.* ¶¶ 77-79).

In late February, Dr. Mukunda asked plaintiff to conduct the reporting; however, the parties could not reach an agreement and plaintiff ultimately did not perform the reporting for the 2015 performance year. Plaintiff has confirmed that the reporting was completed in a timely fashion by defendant or another entity. (*Id.* ¶ 81).

Plaintiff made numerous attempts to communicate with defendant about the ACO's performance for 2015. While plaintiff was unsuccessful in its efforts with defendant, CMS publishes ACOs' performance results on its website. According to the website, defendant achieved a 6.58% savings in 2015, which qualifies it for Shared Savings with CMS. Plaintiff has unsuccessfully attempted to contact defendant to confirm that, once it receives its share of the Shared Savings (which was to be sometime in September or October, 2016), it will pay plaintiff for the services it has performed in accordance with the Consulting Agreement. (*Id.* ¶ 91).

As a result, plaintiff filed the instant lawsuit, bringing claims for anticipatory repudiation/breach of contract and unjust enrichment. It seeks a declaratory judgment, book account, accounting, constructive trust, and compensatory damages. Plaintiff alleges that it is

owed a total of $1,110,567.68 under the Consulting Agreement. Now pending before the Court is plaintiff's motion for a preliminary injunction, which asks the Court to order that defendant not disburse any funds received from CMS until it has first met its payment obligations to plaintiff under the Consulting Agreement and that defendant specifically perform the Consulting Agreement, including its payment obligations to plaintiff.

In its Answer, defendant disputes plaintiff's allegations and has filed a counterclaim against plaintiff, alleging that plaintiff did not perform as required under the agreement and that plaintiff unilaterally terminated the agreement, leaving defendant to fulfill its reporting requirements to CMS without assistance. The only evidence it submits in opposition to plaintiff's motion for preliminary injunction is an email exchange regarding the Group Reporting for performance year 2015. Defendant cites to an email dated February 23, 2016, from one of plaintiff's representatives as evidence that plaintiff did not fulfill its obligations under the Consulting Agreement. The email states: "Kiran had emailed stating we need time till Friday to analyze your data. We cannot commit until we review your data and understand the depth of work that will be involved to report to CMS. So if you can't wait until Friday to complete our review to finalize the cost and you need to move on, we understand that as well." (Def.'s Br. In Opp., Ex. 1).

**LAW AND ANALYSIS**

A preliminary injunction is an "extraordinary remedy." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). A district court may only grant the injunction if plaintiff proves that the circumstances "clearly demand it." *Id.* In exercising its discretion to grant a preliminary injunction, the court is to consider four factors:

> 1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;
> 2) Whether the plaintiff has shown irreparable injury;
> 3) Whether the issuance of a preliminary injunction would cause substantial harm to others;
> 4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason Cty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). In determining whether an injunction is appropriate, the court should make specific findings as to the four factors, "unless fewer are dispositive of the issue." *Performance Unlimited, Inc. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). In general, the preliminary injunction factors create a flexible balancing test. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102. The Sixth Circuit, however, has "never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief." *Id.* at 102-03 (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S. Ct. 937, 952 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")); *see also S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) (affirming denial of preliminary injunction where movant failed to show irreparable injury); *Economou v. Physicians Weight Loss Centers of Am.*, 756 F. Supp. 1024, 1030–31 (N.D. Ohio 1991) (noting that "a plaintiff must always demonstrate some irreparable injury before a preliminary injunction may issue") (quotations omitted)).

Here, the Court need only address the irreparable harm factor because plaintiff has failed to show that it will suffer any irreparable injury if the Court denies its motion. In order to be made whole, plaintiff seeks only monetary damages that it has calculated to the penny: $1,110,567.68. The law, however, is well established that harm that is compensable by monetary

damages is not irreparable. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("The defendants correctly point out that a plaintiff's harm is not irreparable if it is fully compensable by money damages."); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.").

Essentially, plaintiff argues that it will suffer irreparable injury because, in the event that it ultimately prevails on summary judgment or at trial, it will be difficult to collect the money that it is owed:

> [The money] can easily disappear into and out of [defendant's] account quickly and [plaintiff] would be left chasing around needlessly to recover its portion of the payment. [Defendant] was an entity created for the purpose of amalgamating a number of individual medical practices. If distributions are made to those practices and there is nothing left in [defendant's] accounts, there are no assets to satisfy the obligations. [Plaintiff] will then be left with nothing but more litigation and attenuated claims against [defendant's] members ... who would certainly claim corporate insulation.

(Pl.'s Br. at 10). Plaintiff cites no case that would support a finding of irreparable harm under these circumstances. To the contrary, difficulty in obtaining a money judgment because a defendant may dissipate its assets prior to the conclusion of a case is generally insufficient to constitute irreparable harm. The Supreme Court in *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, held that the district court in that case "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." 527 U.S. 308, 333 (1999). This was true despite the district court's finding that "it was 'almost certain' that respondents would succeed on the merits of their claim." *Id.* at 312. The dissent in *Grupo* had argued–similar to plaintiff here–that "the grand aims of equity" include the power to grant relief whenever legal remedies

are not "practical and efficient." *Id.* at 342 (Ginsburg, J., dissenting). The majority, however, explicitly rejected "[t]his expansive view of equity." *Id.* at 321. Indeed, if a party were permitted to obtain an injunction under the circumstances here, then "it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not also apply...for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment.... No relief of this character has been thought justified in the long history of equity jurisprudence." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 222-23, 65 S. Ct. 1130, 1135 (1945).

Moreover, under Federal Rule of Civil Procedure 64(a), "throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Ohio has a prejudgment attachment statute, Ohio Rev. Code § 2715.05. Plaintiff recognizes that the statute is a "valid avenue for relief," but argues that injunctive relief is preferable in this case because of "the cumbersome nature of Ohio's prejudgment attachment law." (Pl.'s Reply Br. at 7). It argues that it would be more efficient for this Court to enter an injunction freezing that portion of defendant's Shared Savings subject to plaintiff's claims than it would be to "send the Sheriff of Cuyahoga County to Defendant's office to look for the CMS bonus check." (*Id.*) The Sixth Circuit, however, has held that "a preliminary injunction may not be granted unless there are valid findings that the legal remedy provided by the state's attachment statutes under Rule 64 is inadequate." *EBSCO Indus., Inc. v. Lilly*, 840 F.2d 333, 336 (6th Cir. 1988). While an injunction may be more efficient, plaintiff has not shown that Ohio's prejudgment attachment statute is

inadequate.[2]

Thus, plaintiff is not entitled to a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, plaintiff's Motion for Preliminary Injunction (Doc. 5) is denied.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/7/16

[2] In fact, on October 31, 2016, plaintiff filed a motion for attachment of property. (Doc. 22). That motion is currently pending before the Court.