UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Enable Healthcare, Inc.,** | ) | **CASE NO. 1:16 CV 2395** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Cleveland Quality Healthnet, LLC,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant's Motion for Summary Judgment (Doc. 57) and Defendant's Motion to Strike the Affidavit of Anthony Subbiah (Doc. 60). This lawsuit arises from a Consulting Agreement entered into by the parties on February 20, 2014. Plaintiff Enable Healthcare, Inc. ("EHI") asserts that it has fulfilled its obligations under the Agreement and is entitled to payment from Defendant Cleveland Quality Healthnet, LLC ("CQH") for its services. The Court has diversity jurisdiction over this lawsuit. For the reasons that follow, both of Defendant's motions are GRANTED IN PART AND DENIED IN PART.

**FACTS**

Medicare Shared Savings Programs were created as part of the Affordable Care Act. Accountable Care Organizations ("ACOs") may apply to participate in the program with the Centers for Medicare and Medicaid Services ("CMS"). The purpose of an ACO is for a group of doctors with a patient base of at least 5,000 Medicare patients to better manage the care of its patients. The goal is that the ACO will achieve a reduction in healthcare costs over time. CMS provides information to the ACO on funds that CMS spent on the patients during the previous three years. In each calendar year, if the ACO is able to reduce spending by a certain target, the savings is shared between CMS and the ACO.

In the spring of 2013, when ACOs were still a relatively new concept, Dr. Venkat Bala, a consultant to EHI, met with Dr. Corattur Natesan to discuss the concept of an ACO. Dr. Bala had never consulted regarding an ACO prior to this time. Dr. Natesan then met with Drs. Beejadi Mukunda and Hari Balaji to discuss the formation of an ACO. The doctors secured sufficient interest and formed CQH.

In the beginning of the parties' relationship, EHI agreed to lead the doctors through the qualification process with the understanding that EHI would provide the technology and guidance through at least the initial phases of the ACO's existence. The parties agree that CQH paid EHI $20,000 for its assistance in establishing the ACO and preparing the application to become an ACO and $40,000 for its implementation services. This part of the parties' relationship is not in dispute. CQH submitted its application on July 31, 2013, and CMS approved CQH as an ACO on October 30, 2013.

EHI and CQH then negotiated the Consulting Agreement that is at issue in this case. The

parties signed the Agreement on February 20, 2014. Under the Agreement, CQH was to pay EHI $370,000 per year for providing the technology platform and consulting resources, plus 12% of profits if CQH qualified for Shared Savings with CMS. In negotiating the Agreement, the CQH doctors were concerned about funds to operate the ACO and make further payments to EHI. The parties agreed on a funding mechanism for these payments, which they called "Operating Resources."[1] The plan was that the Operating Resources funds would come from contributions by various vendors identified by EHI who were willing to contribute cash, services, personnel or other resources to the ACO. CQH could terminate the Agreement if EHI failed to secure Operating Resources to CQH's "reasonable satisfaction." (Consulting Agreement § 6.1(a)). CQH had discretion to accept or reject vendors identified by EHI, (*id.* § 1.2), but "agree[d] to cooperate with [EHI] in [its] efforts to secure Operating Resources," (*id.* § 6.1(a)). The Operating Resources funds were to be the source of EHI's payments for its technology and consulting services:

> Compensation and reimbursement for the Consultant Resources set forth in Exhibit C, Use of Technology ACO Advantage Platform, Consulting Services and all other services and products to be provided under the terms of this Agreement ...shall be paid to the Consultant from the ACO's Operating Resources in installments generally on a monthly basis, or as otherwise agreed by the Parties....

---

[1] "Operating Resources" is a defined term in the Agreement:

> At the option of the ACO, if the funding sources for funds and/or services (which services may include, but shall not [*sic*] limited to, agreements or arrangements, permissible under applicable laws, with skilled nursing facilities, hospitals, home health agencies, infusion programs, hospices, labs, and/or other vendors) required for the Operating Budget set forth and described in Exhibit C, attached hereto and incorporated herein, (the "Operating Resources")....

Consulting Agreement § 6.1.

3

> However, notwithstanding anything contained herein to the contrary, all payments are subject to the availability of funds generated through the Operating Resources.

(*Id.*, Exhibit B, §C); (*see also id.*, Ex. C) ("Except as otherwise provided in this Agreement, all ACO costs shall be paid from funds obtained through the Operating Resources.").

EHI identified various vendors as potential sources of funds for the Operating Resources, including Companion DX ($150,000 per year), an imaging testing company ($125,000 per year), Visiting Nurses (two Rns on a full-time basis plus $150,000 per year), a sleep center vendor ($75,000 per year), Cleveland Diagnostic Laboratories ($100,000 per year), various specialists ($10,000 per year), and LabCorp. and Quest Laboratories ($75,000 per year). (Subbiah Aff. ¶ 50). CQH, however, did not reach any agreements. Dr. Mukunda claims that this was because CQH's executive committee had ethical and clinical concerns about the vendors, (Mukunda Dep. at 85), but Dr. Bala testified that no one at CQH ever explained why the vendors were rejected, (Bala Dep. at 109). Eventually, EHI "slow[ed] up" in bringing vendors to CQH because CQH was not responsive to EHI's efforts:

> Q: Was there any agreement at some point in time to stop bringing vendors for consideration?
> A: We did our best and then we were waiting for CQH to respond. Since they didn't respond, we had to slow up because we cannot take people and then get the same treatment because there was not a reciprocation.

(*Id.* at 108). Ultimately, no Operating Resources were ever received. (Subbiah Dep. at 162-63). CQH, however, did not exercise its option to terminate the Agreement.

CQH also claims that EHI did not provide a workable platform and training to the CQH physicians. As support, it cites the testimony of Dr. Mukunda, who testified that CQH failed to qualify for a bonus in 2014 because EHI did not perform as promised:

> A: From what was presented to us all along was that there is this amazing

4

> technology platform which is going to help us get real-time data, stratify the
> patients being in high risk where they are able to avoid unnecessary expenses,
> take better care of the patients, and save money for the ACO and, also, for CMS.
> That never happened.

(Mukunda Dep. at 101). CQH notes that the doctors only attempted to login on the platform 1,200 times whereas EHI would have expected about 72,000 logins. According to EHI, however, the technology platform it created was workable and was able to stratify the levels of patient risk depending upon severity. (Subbiah Aff. ¶ 34). EHI asserts that the platform "was used to monitor patient care and assist in follow-up of dietary needs, medical needs and other aspects of the patient care plan that the doctor or practice had set out for a particular patient." (*Id.*). EHI also "loaded all of the patient health records onto the technology platform so that the information could be categorized, tracked, monitored and used by the practices." (*Id.*, ¶ 39). Cost and quality metrics were measurable on the platform because it allowed users to determine how money was spent in categories such as date, patient, or procedure. (*Id.*, ¶ 42). EHI also states that it provided training to the CQH doctors and that it was available for training at any time:

> A: Because we provided training. We provided avenues for the doctors to train. I
> provided multiple e-mails of logins and passwords where the doctors could call
> me and set up times to train. I went to their offices to train.

(Samuelraj Dep. at 32, 51).

Finally, CQH claims that, as part of the Consulting Agreement, it expected EHI to provide CMS mandated reporting services, including the group practice reporting option ("GPRO"). Drs. Natesan and Mukunda, though, admit that GPRO is not listed in the Agreement as one of EHI's obligations. (Natesan Dep. at 108); (Mukunda Dep. at 95). For the 2014 reporting year, EHI sent a separate contract to CQH with additional charges for its assistance with the GPRO. CQH paid for these services. CQH achieved some savings in 2014 but fell short

5

of its Shared Savings goal, so it did not receive a bonus from CMS. In February of 2016, the parties discussed the GPRO reporting for the 2015 reporting year. They could not come to an agreement about payment for these services, and CQH ultimately hired another contractor to assist with the GPRO reporting. CQH achieved its Shared Savings goal for the reporting year 2015 and received nearly $3,000,000 in Shared Savings from CMS.

EHI thereafter filed this lawsuit, claiming that it is entitled to be paid $370,000 for 2014-2015, $370,000 for 2015-2016, and 12% of CQH's Earned Shared Savings. EHI brings seven claims for relief. Count One is a claim for declaratory judgment; Count Two is a claim for anticipatory repudiation/breach of contract; Claim Three is a claim for unjust enrichment; Count Four is a claim for a book account; Count Five is a claim for an accounting; Count Six is a claim for a constructive trust; and Count Seven is a claim for injunctive relief. Now pending before the Court are CQH's motion for summary judgment and its motion to strike. EHI opposes both motions.

**MOTION TO STRIKE**

CQH moves to strike the affidavit of Anthony Subbiah, EHI's president. CQH argues that Subbiah's affidavit should be stricken in total because it contains arguments, conclusory statements, and hearsay and "more resembles an adversarial memorandum than a bona fide affidavit." (Def.'s Mot. to Strike at 8).

Affidavits used to support or oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit that does not satisfy these requirements is subject to a motion to strike. *Giles v. Univ. of Toledo*,

6

241 F.R.D. 466, 469 (N.D. Ohio 2007). In resolving a motion to strike, the Court should use "a scalpel, not a butcher knife." *Id.* (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315-16 (1st Cir. 2001). Thus, a court may distinguish between the compliant and non-compliant portions of the affidavit and strike only those portions that do not comply with Rule 56(c)(4). *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015).

While CQH argues that Subbiah's entire affidavit should be struck, it only specifically addresses certain paragraphs. Because the majority of the affidavit is based on facts of which Subbiah would have personal knowledge, the Court will address only those paragraphs that CQH has explicitly addressed in its motion. The Court hereby strikes the following paragraphs of Subbiah's affidavit: 6-9, 19-22, 31, 52, 54, 59, 60, 63, 64, and 68-75. These paragraphs contain conclusory and argumentative statements and lack specific facts showing that they are based on Subbiah's personal knowledge. The Court will not strike paragraphs 32, 36, 37, or 67. CQH argues that paragraphs 32, 36, and 37 contain Subbiah's opinion on the meaning of certain provisions in the Consulting Agreement even though he did not participate in the negotiations. In each of these paragraphs, however, Subbiah includes specific facts regarding the services that EHI provided to CQH during the term of the parties' relationship. (*See, e.g.,* Subbiah Aff. ¶ 32) ("In doing so, EHI worked with the doctors and practices to provide letters to patients explaining the involvement of the practice in the ACO, tutorials for the doctors and staff and telephone scripts for use by staff members when handling questions from the patients that had received the letters."). Paragraph 67 ("Nevertheless, CQH never tried to cancel the contract as per the termination provisions of the Consulting Agreement.") is a statement of fact of which Subbiah would have personal knowledge.

For these reasons, Defendant's Motion to Strike is granted in part and denied in part. CQH's request to seal the attachments to Subbiah's affidavit, which contain the full account number for CQH's PNC Bank account, is granted without objection.

**SUMMARY JUDGMENT STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  *See* Fed. R. Civ. P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local*

*600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**LAW AND ANALYSIS**

**A. Breach of Contract**

Ohio law governs the Consulting Agreement. Under Ohio law, "[a] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the non-breaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the non-breaching party suffered damages as a result of the breach." *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 174 Ohio App.3d 29, 880 N.E.2d 926, 934 (2007). A non-breaching party is excused from performance by the counter-party's material breach. *Freeman Indus. Prods. v. Armor Metal Group*, 193 Ohio App. 3d 438, 952 N.E.2d 543, 552 (2011). The materiality of a particular breach is ordinarily a question for the jury but can be decided as a matter of law when the evidence of the breach is clear, uncontradicted, and indisputable. *Transportation Ins. Co. v. Busy Beaver Bldg. Centers, Inc.*, 969 F. Supp. 2d 875, 889-90 (S.D. Ohio 2013). Courts consider the following factors in determining if a breach is material:

> (1) The extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* (quoting Rest.2d of Contracts § 241). "[W]here a party has partially but not substantially performed his promise contained in an entire contract, and the failure to perform the balance of the contract is not excused, no recovery can be made upon the contract or upon quantum meruit."

10

*W. Wagner & G. Wagner Co., L.P.A. v. Block*, 107 App. 3d 603, 608, 669 N.E.2d 272, 276 (1995) (quotations omitted).

CQH argues that it is entitled to summary judgment on EHI's breach of contract claim for four reasons. The Court will address each in turn.

1. Operating Resources

CQH first argues that it does not owe EHI any compensation for use of the technology platform and a support team because EHI's payment for its technology, data analyst, and clinical analyst services was conditioned upon receipt of Operating Resources from third parties. Because CQH never received any Operating Resources funds, it claims that it does not owe anything to EHI for these services.

A court's role is to give effect to the intent of the parties to an agreement, and courts generally presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement. *Shifrin v. Forest City Enters., Inc.*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501 (1992); *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219–20, 797 N.E.2d 1256, 1261–62 (2003). When the language in a contract is unambiguous, courts will not create a new contract by finding an intent not expressed in the clear language employed by the parties. *Shifrin*, 64 Ohio St. 3d at 638. According to CQH, the language in the Consulting Agreement unambiguously provides that, if EHI did not secure Operating Resources, it is not entitled to any compensation.

EHI argues that the reason there were no Operating Resources funds is that CQH breached its duty of good faith and fair dealing by repeatedly rejecting the vendors that EHI identified as funding sources. Implicit in every contract is a duty of good faith and fair dealing.

11

*Third Fed. S. & L. Assn. of Cleveland v. Formanik*, 64 N.E.3d 1034, 1048–49 (Ohio Ct. App. 2016). "'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'...[B]ad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463, 839 N.E.2d 49, 54 (2005) (quoting Restatement of the Law 2d, Contracts, § 205, Comments a and d (1981)). Whether parties have acted in good faith and have dealt fairly and reasonably with each other or have breached that obligation and acted in bad faith is a question of fact. *Id.* at 464, 839 N.E.2d at 55. In addition to this implicit obligation, the Consulting Agreement imposed on CQH an explicit obligation "to cooperate with [EHI] in [its] efforts to secure Operating Resources." (Consulting Agreement § 6.1(a)).

In its reply brief, CQH does not respond to EHI's argument that CQH breached the duty of good faith and fair dealing and merely repeats its position that it owes no money because it never received any Operating Resources funds. The Court finds that there is a material question of fact as to whether the lack of Operating Resources was due to EHI's failure to meet its obligation under the Consulting Agreement to secure such resources or CQH's interference with or failure to cooperate in EHI's efforts to meet its obligation. EHI identified various vendors that had the potential to be substantial sources of funds for the Operating Resources, but CQH rejected all of them. While Dr. Mukunda claims that CQH rejected the vendors because its executive committee had ethical and clinical concerns about them, Dr. Bala testified that CQH never gave a reason for the rejections. In addition, the Court notes that CQH never exercised its right to terminate the Agreement if EHI failed to secure Operating Resources to CQH's

12

reasonable satisfaction. For these reasons, CQH is not entitled to summary judgment on the basis that there were no Operating Resources funds.

2. Breach

CQH also claims that EHI materially breached the Consulting Agreement because EHI (1) failed to secure a funding source for CQH, (2) failed to provide training, (3) failed to provide a technology platform that worked, (4) failed to provide items and information that would have improved patient outcome, and (5) failed to provide processing and communication with CMS to accumulate and aggregate claims data. The Court finds that there are material questions of fact on each of these points.

As discussed above, there is a question of fact as to whether EHI's failure to secure a funding source for CQH was because of CQH's breach of its duty of good faith and fair dealing or because EHI did not meet its obligation to secure the funding.

With respect to training, EHI has submitted evidence that it did provide training to the doctors. Carter Samuelraj, EHI's business development executive, testified that he provided multiple emails with logins and passwords to the doctors, that he went to the doctors' offices to train them, and that the doctors could call and set up times to train whenever they wanted. (Samuelraj Dep. 32, 51); (*see also* Subbiah Dep. at 120-21) ("I know we sent a project manager from here and a project assistant, plus Carter was there. They visited each and every practice to train the staff and to train the doctors as well, but the doctors always do not have the time.").

Similarly, EHI has provided evidence from which a reasonable jury could conclude that it substantially performed its obligation to create the technology platform for the ACO. Anthony Subbiah, EHI's president, identified a number of key services that the platform was able to

13

perform, including stratifying patient risk, monitoring and tracking patient care, and measuring cost and quality metrics. (*See* Subbiah Aff. ¶¶ 34, 39-46). While CQH argues that the technology platform was never able to integrate the practice groups' existing electronic medical record ("EMR") vendor software as promised, Subbiah testified that this was because the practice groups' EMR vendors "were asking for too much money" and "not cooperative and the practice managers and the doctors were not involved in talking to the EMR vendor to do the interface." (Subbiah Dep. at 111, 114). Moreover, Subbiah testified that the doctors lost minimal functionality of the platform without the EMR integration and that the platform was still viable and valuable to CQH. (*Id.* at 119, 120) ("Q: Did they lose functionality because of the inability of their EMRs to communicate or interface with your platform? A: I can answer it this way: Yes, they would lose a little bit of efficiency, probably minus two percent."). Finally, the fact that the doctors only logged in 1,200 times when EHI would have expected 72,000 logins does not prove that the platform did not work. Rather, it is evidence that the platform was accessible.

Aside from the technology platform, CQH does not identify what items EHI failed to provide that would have improved patient outcome. Thus, this is not a basis for summary judgment.

Lastly, CQH argues that EHI breached the Agreement by failing to perform the GPRO reporting. CQH maintains that EHI was obligated to do the reporting because the Agreement states that EHI was to perform "CMS Claims Data Management and Processing." (Agreement, Ex.A, § C). The Agreement lists a number of services that EHI was to provide under this

category,[2] but as EHI points out and Drs. Natesan and Mukunda admitted, the Agreement does not identify "GPRO reporting" as one of these services. (*Id.*); (Natesan Dep. at 108); (Mukunda Dep. at 95 ("Q: [I]s GPRO reporting listed as a separate expense or a service that is going to be offered? A: GPRO is not listed by name. Q: Right. For that matter, is PQRS reporting listed by name? A: No."). Because the Agreement does not unambiguously state that GPRO reporting is one of the functions that EHI was obligated to perform, the Court may look to extrinsic evidence to decipher the intent of the parties. *Shifrin*, 64 Ohio St. 3d at 638 (noting that courts may resort to extrinsic evidence to give effect to the parties' intentions if the language of a contract is unclear or ambiguous). EHI has produced evidence from which a reasonable juror could conclude that the parties did not intend for GPRO reporting to be a part of the contract. Specifically, for calendar year 2014, EHI sent CQH an additional contract for the reporting services, (*see* Mukunda Dep. at 96-99), which CQH agreed to and states that it paid (Def.'s Br. at 7). (Mukunda Dep. at 96-97) ("Q: And you were told that there was a separate charge for that, so you were presented a reporting addendum, which was a separate contract for your perusal–. A: Yes. Q:–for the reporting year 2014....Q: And you okayed that for them to go ahead and do the GPRO reporting for that year? A: Yes.").

3. <u>Abandonment</u>

Next, CQH claims that EHI's breach of contract claim fails because it abandoned the contract. "Where one party effectively abandons a contract, the other party may accede to the

---

[2] The Agreements lists "i. Establish Communication with CMS; ii. Accumulate and Aggregate Claims Data with each monthly data release from CMS (data warehousing); iii. Prepare Files for Consultant's Data Analytics Platform" as the functions EHI was to perform as part of its claims data management and processing services.

15

abandonment and, in effect, the contract is dissolved by the mutual assent of both parties. In such a case, the parties are restored to their original positions and neither party may sue for breach of the contract, nor compel specific performance." *Coburn v. Auto-Owners Ins. Co.*, 189 Ohio App. 3d 322, 333 (2010). According to CQH, EHI abandoned the contract by not bringing any other providers to CQH for its consideration, not providing any training, and not performing the GPRO reporting for 2015. For the reasons discussed above, there are questions of fact on each of these issues. As for bringing vendors to CQH, EHI provided evidence that it stopped doing so because CQH continually rejected all of the vendors that EHI identified without giving any reason for doing so. As for training, EHI provided evidence that it was willing to train the doctors on the technology platform and attempted to do so, but they did not take advantage of the training. As for the GPRO reporting, the Consulting Agreement does not unambiguously require EHI to perform the reporting, and EHI has submitted extrinsic evidence from which a reasonable jury could conclude that the parties did not intend for it to be a part of the contract.[3]

    4. Fraudulent inducement

Finally, CQH argues that it is entitled to summary judgment on EHI's breach of contract claim because EHI procured the Agreement through fraudulent inducement. "Under Ohio law, a contract procured by fraudulent inducement may be rescinded." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 873 (6th Cir. 2007). To prove fraud or fraudulent inducement, a plaintiff must establish "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter

---

[3]     EHI has withdrawn its claim for $87,500 for use of the platform in 2016. (Compl. ¶ 87); (Subbiah Dep. at 171) ("Mr. Clemente: December of 2015 the ACO was not updated and there would not be a claim for the $12,500 a month after that.").

disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Id.* (quoting *Lepera v. Fuson*, 83 Ohio App. 3d 17, 613 N.E.2d 1060, 1063 (1992)). Fraudulent inducement must be proven by clear and convincing evidence. *Simon Prop. Grp., L.P. v. Kill*, 2010 WL 1266835, at *5 (Ohio Ct. App. April 5, 2010). In support of its position, CQH cites Subbiah's testimony, who stated that he probably did not tell CQH that EHI had never provided ACO services before:

> Q: At the time that you were soliciting CQH or the members, the doctors that would become the members of CQH, did you tell them that you did not consult for any other organization for ACO services?
> A: No. No, we would not.
> Q: Did you tell them that this was your introduction into ACO consulting services?
> A: No. It's not consulting services. It is the platform and the product and the services that we offer.
> Q: Well let me ask you this: Did you tell them at the time you were negotiating with them about providing ACO services, whether it's platform or something else, did you tell them that you had never done it before?
> A: Specifically, I don't remember. I wouldn't do it if I was selling to someone.
> Q: Why not?
> A: Because unless and until that question comes up from the client, from the prospect, why would I expose myself?
> Q: And what do you mean by that?
> A: I think I am very clear and I hope you understand. A prospect is a prospect and you want to impress the prospect.
> Q: If you told them that you had never done it before, you would be concerned that they may not hire you?
> A: Absolutely, yes.

(Subbiah Dep. at 62-63). According to Dr. Mukunda, EHI held itself out as a consultant "knowledgeable in the formation, implementation, and operation of an ACO under the ACA" and "represented itself as having experience and knowledge in forming and consulting with ACOs." (Mukunda Aff. ¶¶ 5, 10). He states that neither he nor the other members of CQH were

17

aware that EHI had never consulted for an ACO before and that they would not have entered into the Agreement with EHI if it had disclosed that it had never consulted for, or assisted in the formations of, an ACO. (*Id.* ¶¶ 12-13).

CQH has not shown by clear and convincing evidence that it is entitled to judgment as a matter of law on its fraudulent inducement affirmative defense. Subbiah testified that EHI did not have a "proven track record" at the time the parties negotiated the Consulting Agreement because ACOs had only been in existence for two years. Notably, none of the CQH doctors asked what EHI's track record was, which Subbiah believed was because they knew that ACOs were new and that EHI did not have experience with them. (Subbiah Dep. at 63-64). Despite EHI's lack of experience, however, Subbiah testified that he and a number of EHI's other employees attended various seminars and conferences and spoke with industry experts before negotiating the Consulting Agreement. (*Id.* at 60-65) ("And you should know by now, Mr. Starkey, that the amount of documents that we had sent to them, the 500 plus documents that we had sent to them, all those things are a proof of our knowledge and experience that we had gained over the period."). Based on this evidence, a reasonable jury could conclude that EHI did not procure the Agreement through fraudulent inducement.

**B. Unjust Enrichment**

CQH is entitled to summary judgment on EHI's unjust enrichment claim. "Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another." *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quotations omitted). Thus, a party to an express

agreement may not recover under a theory of unjust enrichment when the agreement covers the same subject. *Id.* (citing *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (Dec. 2, 2008)). Because EHI's claim is based on an express contract, it cannot also bring an unjust enrichment claim.

### C. EHI's remaining claims

EHI does not respond to CQH's arguments regarding its claims for a book account, an accounting, or a constructive trust. A party waives opposition to a motion if the party fails to respond to arguments raised in the motion. *See Schull v. CitiMortgage,* Inc., No. 11-15643, 2012 WL 4498498, at *4 (E.D. Mich. Sept. 28, 2012) (citing *Scott v. State of Tenn.*, 1989 WL 72470, at *2 (6th Cir. Jul. 3, 1989). CQH is entitled to summary judgment on these claims for the reasons stated in its motion for summary judgment and its reply brief.

EHI agrees that the Court's earlier decision denying its request for injunctive relief is law of the case. CQH is entitled to summary judgment on this claim.

### **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 57) and Defendant's Motion to Strike the Affidavit of Anthony Subbiah (Doc. 60) are GRANTED IN PART AND DENIED IN PART, as set forth herein. CQH's request to seal the attachments to Subbiah's affidavit (Doc. 59-1, which contain the full account number for CQH's PNC Bank account, is granted without objection.


IT IS SO ORDERED.

                                           /s/ Patricia A. Gaughan
                                           PATRICIA A. GAUGHAN
                                           United States District Court
                                           Chief Judge

Dated: 7/20/17